(101 App. Div. 400.)

## NIAGARA FIRE INS. CO. v. CAMPBELL STORES.

(Supreme Court, Appellate Division, First Department. February 10, 1905.)

1. ACTION—DISMISSING COMPLAINT—EFFECT—DISMISSAL AFTER RECEPTION OF ALL EVIDENCE.

Code Civ. Proc. § 1209, provides that a final judgment dismissing the complaint does not prevent a new action for the same cause of action, unless it expressly declares, or it appears by the judgment roll, that it is rendered upon the merits. *Held* that, after the defendant's evidence has been received in an action at law, if on all the evidence the plaintiff has established no cause of action, the proper disposition of the case is a direction of a verdict for the defendant, and not a dismissal.

[Ed. Note.—For cases in point, see vol. 46, Cent. Dig. Trial, §§ 360, 379.]

2. CONVERSION—EVIDENCE—TAKING OF PROPERTY BY BOARD OF HEALTH.

A warehouse belonging to defendant, and in which hides were stored, having been burned, an insurance company acquired title to the hides, and contracted with defendant to excavate the hides from the ruins and he to be paid the expense. The hides were offensive, and the determination of the board of health to remove them was communicated to the company, and thereafter they were taken under direction of the board of health from defendant's possession. *Held*, that the company had no action against defendant for the value of the hides.

Van Brunt, P. J., and Laughlin, J., dissenting in part.

Appeal from Special Term, New York County.

Action by the Niagara Fire Insurance Company against the Campbell Stores. From a judgment dismissing the complaint, plaintiff appeals. Affirmed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Edgar J. Nathan, for appellant.
Henry W. Jessup, for respondent.

INGRAHAM, J. Upon the trial, at the end of the plaintiff's case, the defendant moved to dismiss the complaint. This motion was denied. The defendant then entered upon its case, and introduced its evidence, and when the defendant rested there being no testimony in rebuttal, the defendant again moved to dismiss the complaint, which motion was granted.

We have several times called attention to the impropriety of such a motion after the evidence of both parties has been taken. A dismissal of a complaint in an action at law, under our practice, is equivalent to a nonsuit, which, in effect, is a determination that the plaintiff's evidence is not sufficient to sustain his cause of action. But after the defendant has been heard, and his evidence taken, if upon all the evidence the plaintiff has established no cause of action, the proper disposition of the case is a direction of a verdict for the defendant. In an action at law a dismissal of the complaint does not determine the merits of the action. Section 1209 of the Code of Civil Procedure provides that:

"A final judgment, dismissing the complaint, either before or after a trial, rendered in an action hereafter commenced, does not prevent a new action

for the same cause of action, unless it expressly declares or it appears by the judgment roll, that it is rendered upon the merits."

This applies to actions in equity where the formal judgment in favor of the defendant, no affirmative relief being granted, is a dismissal of the complaint, and this provision was inserted so that such a dismissal in an equity action should not bar a subsequent action unless it appeared that this dismissal was the result of a determination of the merits of the controversy, as the verdict of a jury would be in an action at law when the case had been fully tried. No objection is taken, however, to the form of the direction by the court, and we will assume, in disposing of this case, that the court directed a verdict for the defendant upon all the evidence.

The action is brought by a fire insurance company to recover the value of certain hides stored in the defendant's warehouse that had been destroyed by fire. The defendant, a foreign corporation organized under the laws of the state of New Jersey, maintained a warehouse for the storage of merchandise at Hoboken, in that state. Prior to the 30th of June, 1900, a firm known as Alphonse Weil & Bro. were the owners of a quantity of hides which were stored in the defendant's warehouse of the value of upwards of $40,000, and upon these hides various insurance companies had issued policies of insurance. The complaint alleges that on the 30th of June, 1900, while these policies of insurance were in full force, a fire occurred, which destroyed a part of the warehouse of the defendant and damaged or destroyed a large quantity of hides and other merchandise therein; that the firm of Weil & Bro. filed with the insurance companies proof of its loss by reason of this fire, claiming from the insurance companies the total value of the hides so destroyed, and the said insurance company paid to said Weil & Bro. the value of the hides, the amount of insurance being in excess of that value, and the said insurance company demanded and received from Weil & Bro. an assignment of their right, title, claim, and interest in and to the hides, whether damaged or not, then remaining in the defendant's warehouse; that on or about the 9th of July, 1900, the insurance companies demanded of the defendant the hides which were then stored in the ruins of the warehouse, and that it was agreed between the defendant and the insurance companies that the defendant would proceed to clear up the ruins of the said warehouse, and take out all hides contained therein, and hold the same for the account of the companies, the companies agreeing to sell said hides at auction, and out of the proceeds thereof when sold pay to the defendant the expense of removing the hides from the ruins; that in pursuance of this agreement the defendant did proceed to clear up the ruins and take out certain of the hides which had been damaged, but which, in their damaged condition, were of the value of upwards of $12,000; that, in violation of its agreement with said insurance companies and its duty as warehouseman, the defendant delivered the said hides to other parties, to the damage of the said company in the sum of $12,000. And the plaintiff, having received an assignment from the other insurance companies upon their cause of action against the defendant, asked for judgment for the sum of $12,000. The cause of action is thus based

upon a delivery of the hides to other parties without the knowledge or consent of the insurance companies.

The answer admits and alleges that after the fire a Mr. Lewis, representing certain insurance companies, called upon the defendant, and requested it to take out the hides which might be recovered from the ruins of the warehouse, stating that he desired to sell these hides for the account of the insurance companies; and it was thereupon agreed that the defendant should proceed to uncover said hides for its account, and that, when uncovered, they should be sold, and defendant reimbursed from the proceeds for its actual expense in so doing, and that the balance, if any, remaining, should be turned over to said insurance companies; that the said hides had been imported from foreign countries to the port of New York, and had been stored in bond, subject to the payment to the United States of the custom duties imposed thereon, and that the custom house authorities refused, though requested so to do, to release said hides, or any of them, until the said hides and all other contents of the warehouse should have been recovered, and declined to appraise the goods until they should have all been uncovered, and the duty thereon ascertainable; that while the defendant was proceeding to uncover these goods under the agreement above set forth, the said hides, which were badly injured by the fire, "gave out a stench and smell that caused great public complaint, with the result that on or about the 24th day of July, 1900, the board of health of Hoboken, under and by virtue of powers vested in it by law, duly made an order condemning said hides, and requiring their prompt removal, as constituting a public nuisance, of which action this defendant was notified"; that subsequently, and before the goods had been taken into possession by the insurance company or sold, an order was issued by the board of health of Hoboken to one Harrington, or an agreement made with him by said board, whereupon said Harrington demanded and proceeded at once to remove said hides outside of the limits of the city of Hoboken; that the defendant never received anything for the said hides, and was not reimbursed for its expense in uncovering the same; that the said hides were in fact delivered to Harrington pursuant to the requirements of the board of health, and by him disposed of, but the manner or times of such disposition was unknown to defendant; that the action of the board of health and said Harrington, acting under its authority, rendered the performance of the agreement which the defendant had made impossible, and that this action of the board of health was communicated to Lewis, who was fully advised in relation thereto.

Upon the trial it was proved that the fire commenced on the 30th of June, 1900, and continued until Monday, July 2d; that the fire destroyed the warehouse in which the hides were stored; that subsequently the insurance companies paid the loss to Weil & Bro., and received an order on the defendant for the hides claimed by Weil & Bro.; that this order was turned over to a Mr. Lewis, who was requested to take charge of the matter on behalf of the insurance companies, and a communication was thereupon sent to the defendant stating that Messrs. Woodrow & Lewis were authorized to take charge of all goods remaining in the warehouse and damaged by the fire on June 30th, and

to take such further action as might be necessary for the removal and disposition of the same. Lewis testified that he was one of the firm of Woodrow & Lewis, and that he was employed by the insurance companies to care for the salvage in these warehouses; that he had an interview with a Mr. Campbell, who was president of the defendant corporation, and delivered to Campbell his authority from the insurance companies, and stated to Campbell that he would have to make some efforts to know whether there was anything in the burned storehouse or not; that Campbell said there would be considerable expense to clear up the ruins, and that he did not feel disposed to spend his money on it. Lewis then said: "I will tell you what I will do. I will spend $250 of my money to make a demonstration of it." This proposition was declined. Lewis then proposed that he would join with Campbell and clear up the ruins to the extent of paying Campbell out of the salvage the amount of Campbell's labor on anything that they recovered there in the way of hides. Campbell said that he would do that, Lewis to agree to hold the proceeds of sale of any hides in order to compensate Campbell for money that he spent for labor in cleaning up the ruins of the storehouse, and to that Lewis agreed. Campbell subsequently put a large force of men on the ruins, and about July 9th some of the hides came out, and as they were uncovered they were piled up on one side on the northeast corner of the storehouse. This work proceeded from day to day, and in the latter part of the week of July 9th sufficient of the hides were out to justify a sale. It was then discovered that these hides were in bond, and that they could not be sold or delivered until the custom house authorities had consented. Upon application to the custom house the authorities refused to allow any of the hides to be sold or removed until they had all been recovered from the ruins, in order that they could be appraised; and the government officers subsequently refused to modify this order. The work of taking out the hides was then proceeded with. Subsequently Lewis discovered that a pile of hides on the northeast corner of the wall had disappeared, and he was informed that these hides had been put upon two railroad cars which were upon a side track some little distance off; that they had been put there to keep them out of the sun as they had commenced to smell, and they would not in that way be so offensive; that upon the following Monday Lewis discovered that these cars had been taken away, and when he asked Mr. Campbell about them Campbell said he did not know what had become of them, that he had been informed that they had been sent up the road to some siding or switch, and upon the request of Lewis to have the hides brought back Campbell said they had been ordered away; that other cars were then brought in front of the warehouse, and the hides were being sorted out and placed upon the cars; that on July 24th Lewis asked Campbell to have these hides brought back so that they could be sold, and Campbell said that he would order them back from the siding or switch, wherever it was; that on Wednesday, the 25th, Campbell came to Lewis' office, and said he thought the cars had been returned, when Lewis said, "We will have to have a sale of these hides to-morrow," to which Campbell replied, "All right, the sooner the better," whereupon Lewis

advertised the sale of the hides for Thursday morning, July 26th. On July 26th Lewis, with the auctioneer, went to the premises to conduct the sale, was met by Mr. Campbell, who introduced him to a Mr. Hyde as Campbell's attorney, who would accompany Lewis at the sale. Hyde and Lewis then went to the premises, but found that no hides were there. The defendant's superintendent was asked where they were, and said he did not know. Subsequently Hyde told Lewis that the hides had been removed by a man named Harrington, under some authority given by the board of health of Hoboken. Hyde and Lewis then went to the board of health, and saw the health commissioner, Dr. Helfer. Dr. Helfer stated that he had ordered the removal of the hides, and Lewis then returned to New York, as the hides had disappeared. Upon cross-examination Lewis testified that he received word from Campbell that the board of health had condemned these hides the latter part of the first week after the fire; that on Tuesday, July 24th, he received a letter from Campbell, which was introduced in evidence. By that letter Lewis was notified that the board of health of the city of Hoboken had condemned the hides stored by Weil & Bro., and ordered their immediate removal, and Lewis was notified that he must arrange to remove them immediately; that in default thereof the defendant would be compelled to dispose of them, if possible, and, if not, to destroy them; that the defendant understood that the arrangement made by Lewis with the defendant was still holding, viz., that out of the proceeds of the sale to be effected by Lewis the defendant's expenses in rescuing the goods were first to be paid. Lewis further testified that he had an interview with the health commissioner prior to July 26th, at which the commissioner gave Lewis notice that he would have two days more in which to remove the hides, failing in which they would be seized, and that on July 26th Dr. Helfer told him that he had ordered the hides away.

Dr. Helfer, the health officer, was called by the defendant, and testified that he was acting as president for the board of health in the months of June, July, and August, 1900; that after the destruction of the Campbell stores it was very hot—one of the hottest Julys they had had in many years; that about 170 people had been killed by the fire, and the health board had all they could do to save the city from contagious diseases in consequence of the fire and heat; that the Campbell Stores were burning for a long time, and that very offensive stenches emanated from the warehouse; that about the 8th or 9th of July he told Campbell that something must be done at once to save the lives and health of the inhabitants, because the stench from the warehouse was awful; that Mr. Campbell then immediately engaged a large gang of men to have the débris removed; that they struck a lot of beans, which were very offensive, and which were removed; that they afterwards came across some salted green hides; that subsequently a Mr. Lewis came to see the witness, and Lewis asked the commissioner to give him permission to have these hides auctioned off when they were removed from the débris, to which the health commissioner said that he would do anything that he could to get the hides out of the city of Hoboken; that two or three days elapsed, and nothing was

done towards removing the hides, and the health officer then asked Campbell who were the owners of the hides, and he told him that they had been stored by Weil & Bro., of New York. The health commissioner at once notified them by letter that the hides must be removed.

A notice addressed to the defendant, dated July 25, 1900, was then introduced in evidence. This notice is as follows:

"In accordance with the orders of the Board of Health, already communicated to you, the hides, beans and other matters contained in your warehouse have been condemned as a menace to life and health in this city. In pursuance of this order I desire to notify you that Mr. A. W. Harrington has been directed by me to remove the said hides at once from the city, and I would thank you to afford him every facility for the execution of that order at once."

Lewis had been notified the day previous to the date of this letter that these hides had been condemned and the board of health had ordered their immediate removal. A resolution of the board of health, adopted on July 24, 1900, was introduced, which recited that whereas, the stench arising from the hides and beans was unbearable, and dangerous to life and health, it was resolved "that said green salt hides and beans are hereby condemned by the board as a menace to life and health, and that said owners be ordered to have said hides and beans removed at once." The health commissioner also testified that about the 19th or 20th of July he had an interview with Lewis; that he told Lewis that he did not want to see the lives and health of the citizens menaced; that if Lewis would remove the hides as quick as they came out of the débris he would have no objection to his taking them away, but that he could not give permission to let the hides lie there in the scorching sun, and auctioned off there, because it would take too long, and that he would not have the stench that arose from the hides there any longer, to the menace to the health of any one in the city of Hoboken; that after he had communicated to Campbell the fact that the hides had been condemned as a menace to life and health, the witness engaged a contractor to remove the hides, and made an agreement with Harrington as the contractor, and notice of this contract was given to the defendant by a letter signed by the corporation attorney dated July 26, 1900, which stated that: "The bearer, Mr. A. W. Harrington, is directed by order of the board of health to remove the hides now in your custody as warehouseman at once out of the City in accordance with orders heretofore served upon you. Please deliver the hides to him and he will give you the necessary receipt for the board of health;" that he made an agreement with Harrington to remove the hides, and delivered this letter addressed to the defendant as his authority; that he went down when Harrington was at work to see that his order was complied with, and he saw the hides taken out of the warehouse and removed, and that after that he did not do anything further about it; that after his first conversation with Lewis, at which Lewis was ordered to remove the hides, four or five days were given him to accomplish it; that Lewis promised to do it, but did not, and the witness then took the matter in his own hands, and directed their removal by Harrington, as before stated; that after he gave the final order the

hides were immediately taken away by Harrington under his order from the president of the board of health, and that after that he had no communication from Lewis or any one else in relation to them; that the witness, as president of the board of health, took charge of the removal of the hides; that he went down to the Campbell Stores, saw the order to remove the hides executed, and had nothing more to do with the transaction.

The statutes of New Jersey in relation to powers of the boards of health were then introduced in evidence. Section 27 of the General Statutes of New Jersey provides:

"That a notice of any inspector of any local board of health to abate any nuisance, or by the executive officer or other authorized member of said board, shall be taken as notice from the board, and if the owner or person notified shall fail to abate the nuisance complained of, the said board may cause the same to be abated in a summary way, giving written directions to the inspector in relation thereto, and he shall proceed according to the directions so given."

Mr. Campbell testified that he was connected with the defendant: that the health officer came to his office after July 12th, when they had begun to work at the ruins, and instructed Campbell to remove the contents of these burned storehouses as soon as possible, as they were becoming offensive and dangerous; that after the beans were removed and the hides were exposed the health officer again came to Campbell, and told him that he must give him a notice to get these hides off; that he asked him who were the owners of the hides, to which Campbell replied, "Alphonse Weil owns the hides," but that Weil had settled with the insurance company; that the next thing he heard he got an order from the board of health condemning the hides and directing their removal; that he did not personally see Harrington, who removed the hides, at all; that after he received this order from the board of health he saw Lewis, stated that he had received the order from the board of health to deliver the hides to Weil, but that Lewis said that the hides belonged to him, and that he had no right to deliver them to Weil, and the witness did not deliver them to Weil.

The superintendent of the defendant testified that the notice of condemnation signed by the health officer and the certified copy of the resolution of the board of health were served personally upon him; that Harrington, with whom the president of the board of health made a contract to remove the hides, took them and delivered to the defendant a receipt, which was introduced in evidence; that these hides, when taken out, were wet by the water that was used to extinguish the fire; that many of them were rotten, and stuck together, and were very offensive; that the president of the board of health, on or about the 20th of July, notified the witness that these hides had to be taken away; that in pursuance of that order he put them on the cars, and a locomotive came and pulled them away.

This testimony was not disputed, and the situation, therefore, was that these hides removed from the ruins of this storehouse were wet and rotten, and extremely offensive. After the fire, which destroyed a considerable portion of the docks and water front in the city of Hoboken, the health authorities determined that the public health of

the city required that these hides should be removed. Lewis, representing the insurance companies, was repeatedly notified of this determination of the health authorities. The health department, acting under legislative authority, undertook to and did remove the hides, without the consent of the defendant. It is not disputed but that the defendant gave Lewis notice of the action of the health authorities that was communicated to it, and certainly the defendant was not responsible for the action of the health officials or their agent in removing these hides. They were taken out of the possession of the defendant by paramount authority, over which the defendant had no control, and which the defendant could not have resisted; and it seems to me that this relieved the defendant of responsibility to the plaintiff or the other insurance companies for a failure to produce or deliver the hides. It is entirely immaterial, in relation to a claim against the defendant based upon a delivery to other parties, whether the action of the health authorities was justified or not. They had the power to remove the hides if their presence was a menace to the life of the community. They exercised that power, and took them out of the possession of the defendant, and removed them. If the plaintiff wished to recover possession of these hides, it was the health authorities, or their agents who removed them, that it should have proceeded against, and not the defendant.

There was no question of fact for the jury. Under the contract as alleged in the complaint and testified to by the plaintiff's witnesses, all that the defendant agreed to do was to take the hides out of the building. Lewis then agreed to sell the hides and to repay to the defendant the expense incurred. After the hides were removed and placed on one side out of the building, they were as much in the possession of Lewis as of the defendant, and certainly the defendant was not responsible for their removal by the health officers in order to preserve the public health. There is not a particle of evidence that the defendant did not act in good faith, or that they participated in or consented to the removal of the hides. They acquiesced in the exercise of power of the health officials, which it does not appear they could successfully have resisted. There are no exceptions to rulings on question of evidence relied on by the plaintiffs.

I think, therefore, that on the whole testimony the defendant was entitled to the direction of a verdict, and that the judgment appealed from should be affirmed, with costs.

McLAUGHLIN, J., concurs.   PATTERSON, J., concurs in result.

LAUGHLIN, J. (dissenting). By the settlement with the owners of the hides and the delivery of the warehouse receipts the title to the hides passed to the insurance companies, to the knowledge of the defendant, while the hides were still in the possession of the defendant as warehouseman, and before they had been uncovered or removed. As warehouseman it then became the duty of the defendant to deliver the hides to the insurance companies, and the same duty continued under the contract made by the defendant with the representative of the insurance companies for the excavation of the hides from the

ruins.  It is alleged in the complaint that the defendant, in violation of
its duty in this regard, failed to deliver the hides to the plaintiff, and
without the plaintiff's knowledge or consent delivered them to other
parties, and the action is brought to recover the damages thereby sus-
tained.  The measure of damages is clearly the value of the hides at
the time they were excavated and delivered to other parties.  It is not
material to the plaintiff's right of recovery whether the delivery to
other parties was innocently through a mistake of fact or law, or
whether it was tortious.  I do not question the doctrine that, if the
hides were taken from the possession of the defendant by legal author-
ity, it would not be liable; but in these circumstances it was incumbent
on the defendant to show that the health authorities, in the exercise
of their legal rights, took possession of, and removed the hides.  Rob-
erts v. S. S. D. Co., 123 N. Y. 57, 25 N. E. 294, 9 L. R. A. 438, 20 Am.
St. Rep. 718.  I am of opinion that the evidence required the submis-
sion of the case to the jury, and the exception to the dismissal of the
complaint was well taken.  There was evidence tending to show or
fairly justifying the inference of collusion between the defendant and
Weil & Bro., the former owners of the hides, and some of the health
authorities.  The wrongful interference of Weil & Bro. and their
attempt to get possession of this property after their loss had been
adjusted and the title had passed to the insurance companies, to the
knowledge of the defendant, clearly appears.  After the defendant had
contracted with the insurance companies to excavate the hides on a
quantum meruit, it received a proposition from Weil & Bro. to ex-
cavate the hides for them for the consideration of $1,000, which the
defendant took under serious consideration, and apparently only re-
frained from accepting under legal advice.  It is to be borne in mind
that no action was taken by the board of health until the 24th day of
July.  The original understanding between the defendant and the rep-
resentative of the insurance companies was that, as the hides were ex-
cavated, they would be sold from time to time, and sufficient retained
to compensate the defendant.  The hides being bonded, and the duty
not having been paid thereon, this plan could not be carried out on ac-
count of the refusal of the custom house authorities to consent thereto
until all the hides should be excavated.  As the hides were removed
they were piled and stored on the premises.  The representative of the
insurance companies apparently accepted the action of the customs
officials as final, but it seems that Weil & Bro. made efforts to have the
government officials release the hides.  The hides were released, and
the fair inference is that it was at the instance of Weil & Bro.  Without
consulting the representative of the insurance companies, who appeared
on the scene daily, the defendant, on or about the 21st day of July—
three days prior to any action by the board of health—loaded two cars
with these hides, and the evidence justifies the inference that it either
billed or consented to the billing of one of the cars to Salamanca and
one to Gowanda in the name of Weil & Bro., and the cars were re-
moved from the immediate vicinity.  Whether the cars were actually
shipped at that time does not definitely appear, but there is no evidence
that they were seen subsequently, although in answer to inquiries on

the part of the representative of the insurance companies it was claimed on the part of the defendant that they had been sent to a siding or switch nearby, and that they had been subsequently returned to the vicinity of the warehouse on his request, for the purpose of having the sale.   It appears that this shipping bill or receipt was subsequently canceled, and a new one substituted, showing that the cars were shipped by Harrington, whom the president of the board of health had directed 'to remove the hides; but the date was not changed.   In these circumstances the inference would fairly be justified that these two car loads were shipped prior to the action of the board of health. Nothing occurred prior to the time that these cars were originally billed to warrant the action of the defendant in billing or shipping them or permitting this to be done.   The only interference by the health authorities down to that time was oral directions by the president of the board of health to the defendant's president and some of its employés, which were communicated to the representative of the insurance companies, that the hides were a menace to public health, and must be removed, except that, after the president of the board of health knew that the insurance companies were the parties in interest, it appears that on the 19th of July he wrote to Weil & Bro. directing the removal of the hides, and saying that the board of health had declared them to be a nuisance; and it also appears that Weil & Bro. had in their possession what purported to be a certificate of the clerk of the board of health, addressed to the collector of the port of New York, certifying that the hides had been declared 'by the board to be a nuisance.   There had been no adjudication that the hides constituted a nuisance, and there was no authority on the part of the board of health, or any one connected with it, to remove them at this time.   The plaintiff therefore was entitled to go to the jury as to the defendant's liability as to these two cars, if not to a direction of a verdict thereon, provided it gave evidence of damages, which I think it did.   The evidence shows the number of hides, their condition, the market value of sound hides, that about one half of these hides were sound, and that the other half were damaged about 50 per cent.   This evidence would manifestly justify a recovery of substantial damages.

Moreover, I think questions of fact were presented requiring the submission to the jury of the plaintiff's right to recover the other eight car loads of hides.   The statute regulating the powers and duties of the board of health of Hoboken, so far as drawn to our attention, does not provide for a notice of hearing by the owner before property may be condemned as a nuisance injurious to public health.   It is unncessary to determine, however, whether any action that could be taken by the board of health in these circumstances would justify the confiscation of private property as a nuisance; for, although the board of health acting ex parte adjudged these hides to be a menace to the public health, and directed that the owners be ordered to remove them, it did not direct the defendant to remove them, and did not authorize any one to remove them in behalf of the board of health.   It is claimed that the removal was made, not by the defendant, but by Harrington, acting under a contract with the president of the board of health.   The board

of health did not authorize this contract; and, if the eight cars were removed thereunder, the action was without legal authority, and should not have been acquiesced in by the defendant. Roberts v. S. S. D. Co., supra. I am of opinion that it would not have been acquiesced in by the defendant had not the defendant, Weil & Bro., the president of the board of health, and the contractor been acting in collusion.

I therefore dissent from the affirmance.

VAN BRUNT, P. J., concurs.